Filed 12/17/14  In re C.S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re C.S., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065863 |
| Plaintiff and Respondent, | (Super. Ct. No. 517409F) |
| v. | |
| F.D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura Birkmeyer, Judge.  Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Respondent and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

F.D. (Father) appeals from a juvenile court order terminating his parental rights to his minor son (CS). (Welf. & Inst. Code, § 366.26.)[1] Father challenges the sufficiency of the evidence to support the court's finding that the beneficial parent-child relationship exception did not apply to preclude termination of parental rights. We affirm.

FACTUAL AND PROCEDURAL SUMMARY

*Background Information*

CS and his fraternal twin brother were born about two months premature in August 2012. Their mother (Mother) reported she had abused alcohol and cocaine while pregnant. Mother had four other children, each of whom had been removed from her care. Two had been adopted and two were subject to permanent plans. Mother identified the twins' father as "Anthony," but did not know his whereabouts.

The San Diego County Health and Human Services Agency (Agency) detained the twins while they were still in the hospital. At the jurisdiction/disposition hearing, the court assumed jurisdiction and removed the twins from Mother's care (without objection) because of her inability to properly care for them. The court ordered reunification services for Mother, and set a six-month review hearing.

Within several months, Father came forward as a possible biological parent. Paternity test results revealed a 99.99 percent probability that Father was the biological father of CS, but excluded him as the father of CS's twin brother. Counsel was appointed

_____

[1] All statutory references are to the Welfare and Institutions Code.

2

for Father, and the court found Father was the presumed father of CS but not of his twin brother.

In the sixth-month hearing report, the social worker summarized Father's lengthy criminal history, which spanned more than 20 years and included numerous drug-related, assault, battery, and domestic violence arrests and convictions. The social worker also set forth facts showing that Father had engaged in many serious acts of domestic violence against Mother, including being arrested for abusing Mother while she was pregnant with the twins.

Based on the information presented, the court found the twins' return to parental custody would be detrimental. The court ordered reunification services for both parents. Regarding Father, the court ordered supervised visitation, and ordered Father to participate in domestic violence treatment, complete a substance abuse assessment, and complete a parenting course. Father began taking parenting classes, but did not comply with the rest of his case plan.

During the next five months, Father consistently visited with CS on a weekly or twice-weekly basis. During the visits, Father was loving and appropriate, attentive to CS's needs, and chose appropriate activities. However, Father continued to engage in domestic violence against Mother, and Mother obtained a restraining order against him. In October 2013, Father was arrested after an altercation between the parents. Father missed the next several months of visits because of his incarceration.

3

After Father was released from custody in December 2013, he resumed weekly supervised visits with CS. Father continued to be appropriate and caring during these visits.

At the 12-month review hearing, the evidence showed Father had made only minimal progress towards his case plan and failed to mitigate the protective issues. Although Father completed the parenting portion of the plan, he did not enroll in a substance abuse program, missed three drug tests, and tested positive for morphine and PCP on two other tests. The court found that Father had not made meaningful efforts to complete his case plan, and that the evidence did not support a substantial probability of return by the 18-month hearing. The court made similar findings with respect to Mother. Thus, the court terminated reunification services for both parents and scheduled a section 366.26 hearing.

*Section 366.26 Agency Report and Recommendations*

Four months later, Agency social worker Kathleen Forbes prepared a report for the section 366.26 hearing. In the report, Forbes summarized the current status of CS and his twin brother. She said the 17-month-old twins have lived in a foster home for about 13 months with a foster parent who was interested in adopting them. She said the twins are "friendly" and "charming" toddlers, who are strongly bonded to each other and to the foster parent. CS is "sweet and observant" and "easy going." The caregiver has provided good care to the twins; she is protective and dedicated to their physical and emotional needs; and has a strong family support system. The caregiver has an approved adoptive home study.

4

Forbes also stated that if the current caregiver cannot adopt, there are several families with approved adoptive home studies who are interested in adopting children with the twins' characteristics. She said there are 47 families interested in adopting each boy alone, and 29 families interested in the sibling set.

Regarding Father, Forbes said that Father has "visited regularly and successfully [with CS] when able, and clearly loves his son," and that CS is "content" during the visits. But Forbes also noted that Father's continued criminal behavior has interrupted the regular visits and has precluded unsupervised visitation. Based on her expertise and evaluation of the relevant facts, Forbes opined that Father does not have a parent-child relationship that outweighs the benefits of adoption. Forbes explained: "The key developmental task for infants and young toddlers is forming a primary attachment with their caregiver in order to learn security, trust, and hope. Their parents have not been a consistent presence in [their] lives that would have formed a relationship that would lead to detriment for the children if parental ties were severed. [¶] . . . [¶] [The twins] deserve permanence, safety, and stability for their next 17 years that adoption can best provide. . . ."

Based on these facts, the Agency recommended the court find by clear and convincing evidence that it is likely the children will be adopted if parental rights are terminated and that none of the section 366.26, subdivision (c)(1)(B) exceptions apply.

*Section 366.26 Hearing*

The next month, in March 2014, the court held the section 366.26 hearing. Mother and Father were present and each was represented by counsel. The twins were also

5

represented by counsel. Social worker Forbes and the Agency's counsel were also present.

At the outset of the hearing, the Agency's counsel requested the court receive and consider Forbes's report, and all parties stipulated to the court doing so. All counsel also waived the right to cross-examine Forbes.

Mother stipulated to the Agency's recommendations.

Father objected to the termination of parental rights, arguing that termination was not in CS's best interests because of the existence of a strong father-son bond. In support, Father testified about his positive weekly visits with his son, explaining that CS is always very happy to see him and that he is always careful to attend to CS's needs, including trimming his nails, combing his hair, and changing his diaper. Father said he taught CS how to walk, and also has been teaching CS to count by using developmental toys and demonstrating numbers on his fingers. CS runs to him, smiles, and mimics him when they are together. CS sometimes cries at the end of their visits.

Father said he is aware that he has "a few issues that [he has] to straighten out" and is not ready to accept custody of his son, but said he loves his son "with all [his] heart and soul," and knows that CS loves him in return. He requested the court order long-term foster care "so that I can be able to get myself together" to reunify with CS in the future. Father said he is attempting to find a job so that he can afford domestic violence classes.

At the conclusion of the evidence, the Agency's counsel urged the court to accept the social worker's recommendations and order parental rights terminated. Counsel noted that the evidence was undisputed that the children are generally and specifically

6

adoptable. Counsel also argued that the asserted exception to parental termination was inapplicable because Father had only limited supervised visitation with CS and did not have a parental relationship with his son. Minor's counsel joined in these arguments. Minor's counsel stated that "while I don't doubt the love of these parents for these children, there is no evidence to show that there is a parent-child relationship or . . . bond that is significant enough to outweigh the benefits of adoption."

Father's counsel urged the court not to terminate his parental rights, emphasizing that Father took full advantage of visitation opportunities and consistently visited with his son when he was permitted to do so. Counsel also stressed Father's manifested love for his son and the emotional ties between Father and son, and the importance of "biology" in a child's life.

*The Court's Findings*

After considering all the evidence and arguments, the court found by clear and convincing evidence that CS and his twin brother would be adopted if parental rights were terminated. The court found the twins were generally and specifically adoptable, and their foster parent had completed an adoption home study and was interested in adopting them. The court noted that the twins have made great strides since their premature births, and are "fun" and "intellectually curious" children. The court also noted the special bond CS and his brother share as twins, and ordered that they be adopted only as a sibling set. The court stated that the current caregiver has done a "marvelous job in meeting their needs"; they are "very significantly bonded" and have "thrived in a loving, secure home." The court stated that although the twins had a

7

difficult start "as preemies . . . with drug exposure in utero . . . they have just done a beautiful job in catching up" and the stability in the caregiver's home "has contributed greatly to their . . . developmental advancements."

On Father's argument regarding a beneficial relationship exception to adoption, the court found that Father has consistently and regularly visited with CS, but that Father did not establish the benefit of maintaining the relationship outweighed the benefits of adoption. The court explained its reasoning as follows:

> "Father sits here today, I know loving his son very much. He is essentially saying, 'Keep my child in foster care while I try to get it together to a point where I can have a greater relationship with my son other [than] supervised visitation.' . . . [¶] [However, the court must] consider the nature of their relationship today. And not on a whim and a prayer, with a hope that Father's situation may improve in an undetermined period of time. . . . [¶] And while the court certainly acknowledges that Father has had . . . very pleasant visit[s] with his son, . . . [¶] . . . [t]he court must also consider . . . the fact that the reason his visitation[s] [were] supervised was because Father did not address his significant violence issues and drug issues . . . . So it's by [his] actions that his visitation was limited in time. [¶] . . . And clearly Father was loving with his son, concerned about his son's hygiene and wanted to engage with his son. I understand all of that. . . . Taking into account all of the variables, I do not find [the] positive and pleasant visitation . . . comprises a substantial positive emotional attachment such that [CS] would be greatly harmed if his parental rights were severed."

## DISCUSSION

### I. *Applicable Legal Principles*

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a

8

full emotional commitment to the child. (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid*.)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*); accord *In re D.M*. (2012) 205 Cal.App.4th 283, 290.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one or more of the enumerated statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi).) The parent has the burden of establishing the facts supporting an exception. (*In re C.F*. (2011) 193 Cal.App.4th 549, 553 (*C.F.*).) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1350.)

In this case, Father relied on section 366.26, subdivision (c)(1)(B)(i), which provides an exception to the adoption preference if terminating parental rights would be "*detrimental* to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would *benefit from continuing the relationship*." (Italics added.) We have interpreted the phrase "benefit from continuing the relationship"

9

to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, 27 Cal.App.4th at pp. 574-575; accord, *C.F., supra*, 193 Cal.App.4th at pp. 555-559; *In re Jason J*. (2009) 175 Cal.App.4th 922, 936-937 (*Jason J*.).)

To meet the proof burden for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*C.F., supra*, 193 Cal.App.4th at p. 555; *Jason J., supra*, 175 Cal.App.4th at pp. 936-937; *In re Derek W*. (1999) 73 Cal.App.4th 823, 827 (*Derek W*.).)  The parent must show he or she occupies a parental role in the child's life that results in a significant, positive emotional attachment from child to parent. (*C.F., supra*, at p. 555; *Derek W., supra*, at p. 827; *In re Elizabeth M*. (1997) 52 Cal.App.4th 318, 324.)  "A friendly relationship . . . 'is simply not enough to outweigh the sense of security and belonging an adoptive home would provide.' " (*Jason J., supra*, 175 Cal.App.4th at p. 938.)

We review the court's finding on the applicability of a statutory exception for substantial evidence.  (*Autumn H., supra*, 27 Cal.App.4th at p. 576.)  We consider the

10

evidence in the light most favorable to the court's finding, resolving all conflicts in support of the order. (*C.F., supra*, 193 Cal.App.4th at p. 553.)

## II. *Analysis*

Father challenges the sufficiency of the evidence to support the court's finding that he did not prove the beneficial relationship exception.

At the time of the section 366.26 hearing, 17-month-old CS had been in his foster parent's care for most of his life and was thriving. He was strongly bonded to his twin brother and to his foster parent. The court specifically found that the stability and nurturing he received from this placement was essential to his development from a premature sickly baby to a healthy and intellectually curious toddler, and that continued stability was important to support CS's continued progress and development.

The court recognized that Father had regularly visited with CS, and had manifested loving care towards his son during the visits. But the court also found the relationship was not parental. Overwhelming evidence supported this finding. The evidence showed CS looked to his foster parent for his daily needs, and during his brief visits with Father, he regarded Father as a "friendly visitor" rather than as a parent. Even though Father engaged in certain parental-type tasks while the two were together (such as cutting CS's nails and teaching him to count), the court had an ample basis to find that CS did not have the type of emotional attachment to Father that would cause him to be greatly harmed if parental rights were terminated. (See *Jason J., supra*, 175 Cal.App.4th at p. 938.)

The court also had a reasonable basis to conclude that refusing to permit adoption would be substantially detrimental to CS given the unusual situation that his twin brother was going to be adopted without objection. Father had no standing to object to the twin brother's adoption, nor did he ever express interest in developing a relationship with, or obtaining custody of, the twin. The court made clear its factual finding that the twins must be kept together for their best interests. The court thus reasonably concluded it would not be in CS's best interests to be in foster care while his twin became available for adoption.

Father cites numerous cases in support of his position that termination was improper in this case, but none are helpful. For example, Father relies on *In re S.B.* (2008) 164 Cal.App.4th 289, in which this court found the court erred in terminating parental rights where the evidence showed the father had been his child's primary caretaker for three years, and after one year apart the child maintained a strong attachment to her father and would be "greatly harmed" by the termination. (*Id.* at pp. 300-301.) The *S.B.* father had complied with every aspect of his case plan to resolve the issues that led to his daughter's dependency. (*Id.* at p. 298.)

This case is different. There was no showing CS would be harmed by the termination. Additionally, Father has never been CS's caretaker, and although Father had consistent visits with CS, Father took no meaningful steps to reunify with CS during the statutory time, including to resolve his serious drug abuse and domestic violence issues.

Father also argues that the juvenile court erred in relying on *Derek W., supra*, 73 Cal.App.4th 823. The court quoted *Derek W.* in explaining that the beneficial

12

relationship exception does not apply if a parent is merely a loving visitor and has not established " 'the sort of consistent daily nurturing that [marks a] parental relationship.' " (See *Derek W., supra,* at p. 827.) This statement is an accurate statement of the law. Contrary to Father's arguments, the fact there are factual differences between this case and *Derek W.* does not show the court erred in quoting from *Derek W.* to describe the correct legal standard.

Moreover, the material facts here are similar to *Derek W.* There the court found that although the 10-year-old child visited regularly with his father, the relationship did not support the statutory exception because he was strongly bonded with his foster parents and his relationship with his biological father bore "no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*Derek W., supra*, 73 Cal.App.4th at p. 827.) Similarly, the evidence shows CS is strongly bonded at his current placement, and had only limited supervised visits with Father. As in *Derek W.*, the court had a reasonable basis to find these visits did not develop into the type of emotional attachment that outweighed the benefits of adoption.

We also reject Father's argument that even assuming he did not have a parental role with his young son, long-term foster care or guardianship is a better option for CS. Father asserts that terminating parental rights will "run[ ] the entirely unnecessary but very real risk of casting [CS] into lifelong crisis and inability to form healthy . . . relationships." This speculative argument is unsupported by any facts in the record, and we reject it. We likewise find unhelpful Father's reliance on various law review articles and other commentary which he says support the view that foster care is a better

13

alternative to adoption when a parent cannot reunify with his or her child. Because this view is inconsistent with the Legislature's express statutory mandate, we find it unhelpful. Absent specific evidence in the record compelling a finding that CS will suffer "detriment" from a termination of parental right, we must uphold the trial court's findings. (§ 366.26, subd. (c)(1)(B).)

DISPOSITION

Order affirmed.

HALLER, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

14